# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-2020V
UNPUBLISHED

| | |
|---|---|
| PAUL ENSTROM,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: December 16, 2022<br><br>Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Influenza (Flu) Vaccine; Guillain-Barré syndrome (GBS). |

*Nancy Routh Meyers*, Turning Point Litigation, Greensboro, NC, for Petitioner.

*Christine Mary Becer*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION ON DAMAGES[1]

On December 29, 2020, Paul Enstrom filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). The case was assigned to the Office of Special Masters' Special Processing Unit (the "SPU"). Respondent conceded that Petitioner had suffered Guillain Barré syndrome ("GBS") after receipt of an influenza ("flu") vaccination administered on January 30, 2020, as listed on the Vaccine Injury Table. However, the parties reached an impasse on the appropriate award for pain and suffering from that injury, leaving that issue to my resolution.

---

[1] Because this unpublished opinion contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the opinion will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons set forth below, I find that Petitioner is entitled to **$171,279.47 (representing $170,000.00 for actual pain and suffering, plus $1,279.47 for actual unreimbursed expenses)**.[3]

## I. Relevant Procedural History

As noted above, Petitioner initiated his claim in December 2020.[4] In August 2021, Respondent conceded entitlement and the case formally moved into the damages phase. Rule 4(c) Report (ECF No. 19); Entitlement Ruling (ECF No. 20). But even after ten months they could not reach agreement. ECF Nos. 26-34. On July 27, 2022, Petitioner filed a Damages Brief, in which he requested an award of $180,000.00 for his "past and future" pain and suffering. Damages Brief (ECF No. 36). Respondent submitted that a lower award of $107,500.00 would be appropriate. Response (ECF No. 37). On September 13, 2022, Petitioner filed a Reply (ECF No. 39). The matter is ripe for adjudication.

## II. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594,

---

[3] The parties have stipulated to the out-of-pocket damages component. *See* Response at n. 1; Reply at 8.

[4] Petitioner filed the medical records required by the Vaccine Act alongside his petition in December 2020. Exhibits ("Exs.") 1-14. He filed updated medical records (Exs. 15-16) in early 2022, and damages affidavits from himself and his wife (Exs. 17-18) on July 27, 2022.

at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)). I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[5] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. *Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (2013). Judge Merow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

### III. Relevant Medical History

I have reviewed both parties' arguments and all submitted evidence. I find the following to be most relevant to the damages determination. All citations are to the medical records unless otherwise noted.

---

[5] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

- Upon receiving the subject vaccine on January 30, 2020, Petitioner was 56 years old with a non-contributory medical history. *See generally* Ex. 1.[6] He was recorded to be active, walking several miles a day, and engaged in work around the house. *Id.* at 13. He lived with his wife on their cattle ranch in Nucla, Colorado. *See* Ex. 4 at 14. He was employed full-time as a safety coordinator for a power company. *See* Ex. 2 at 7; Ex. 3 at 40.

- On March 5, 2020, Petitioner presented to a chiropractor in Montrose, Colorado complaining of progressive numbness in his extremities, weakness, difficulty walking, and back pain. Ex. 2 at 5-9. On the chiropractor's instructions, that same day, Petitioner presented to Montrose Memorial Hospital's emergency room ("ER").[7] At the hospital, a physical exam documented an abnormal finger-nose test; abnormal gait; weakness; sensory deficits; diminished reflexes; and bilateral Babinski signs. Ex. 3 at 41-42. CT scans of the head and neck were unremarkable. *Id.* at 57. "Early" GBS was suspected, but a lumbar puncture was not performed "as it would be very early in the course and may be false negative." *Id.* at 45. Petitioner was sent home with plans to attend an outpatient neurology consultation the following week, pending an outpatient appointment the following week, absent any acute worsening or the development of bulbar-type symptoms. *Id.*

- By March 7, 2020, Petitioner became "concerned… enough" by his continued symptoms that rather than waiting for the scheduled outpatient neurology appointment, he returned to the ER. Ex. 3 at 9-13. He underwent MRIs of the brain as well as the cervical, lumbar, and thoracic spine. *Id.* at 14, 29-34. The emergency attending physician determined to proceed with a lumbar puncture and a formal neurology evaluation, which would take place at St. Mary's Hospital and Regional Medical Center in Grand Junction, Colorado. *Id.* at 14.[8] Petitioner was assessed to be stable. He and his wife wanted to drive themselves, but the providers insisted on ambulance transfer. *Id.*

- After admission to St. Mary's Hospital, Petitioner was documented to have normal motor tone; normal sensation (but "subjective numbness and tingling"); normal strength in the upper extremities; slightly decreased (4-) strength in the lower extremities; trace or absent deep tendon reflexes; and abnormal gait. Ex. 4 at 229. A lumbar puncture showed "markedly elevated CSF glucose and protein." *Id.* at 238, 247, 281. A neurologist, Seth Andrew Kareus, M.D., assessed GBS and started a five-day course of IVIg. *Id.* at 231, 241. Per subsequent records,

---

[6] *See also* Rule 4(c) Report; Damages Brief; Response; and Reply (omitting prior history).

[7] Petitioner's home address in Nucla, Colorado, is approximately 90 miles away from both the chiropractor and the hospital in Grand Junction, Colorado. Ex. 2 at 7; Ex. 3 at 40. Petitioner avers that no medical facilities were closer. Brief at n. 1.  The medical records also reflect that his wife attended these medical encounters, and thus, she potentially did the driving.

[8] St. Mary's is approximately 60 miles away from Montrose Hospital, and approximately 105 miles away from Petitioner's home.

4

- Petitioner "did not have any progression of his weakness or numbness after starting IVIg, never had abdominal, respiratory, or autonomic involvement." *Id.* at 246.

- On March 13, 2020, Petitioner was transferred to St. Mary's inpatient rehabilitation facility, where he completed the IVIg course. His leg strength and gait did not worsen or improve. Ex. 4 at 58-59, 245-47.

- Petitioner also noted the recent worsening of chronic neck, shoulder, and back pain. Ex. 4 at 248; *see also id.* at 254 (noting "chronic midline low back pain with bilateral sciatica"). The treaters posited that this could be due to "positioning or compensation" stemming from GBS. Ex. 4 at 263.

- Petitioner received various pain relief measures including prescription-strength acetaminophen, oxycodone, Toradol, gabapentin, diclofenac sodium topical gel, and cyclobenzaprine while at St. Mary's Hospital and/or inpatient rehabilitation (which by and large, did not continue after his discharge). Ex. 4 at 77-91.[9]

- On March 19, 2020, Petitioner was discharged home with instructions to utilize support when bathing, transferring from a seat, and ambulating around the house. He would follow up with outpatient neurology and physical therapy ("PT"). Ex. 4 at 53-54. He was also advised to make a "gradual return to work and certainly to abide by social distancing." *Id.* at 67.

- On April 16, 2020, Petitioner presented to Logan McDaneld, M.D., at a neurology clinic in Grand Junction, Colorado. Ex. 5 at 7.[10] No particular symptoms are recorded, but Petitioner was "stable without noticeable improvement or progression." *Id.* He still had a prescription for acetaminophen to address headaches and "mild" pain," and was taking gabapentin 300 mg three times a day. *Id.* at 7-8.

- After conducting EMG/NCS testing of the lower extremities, Dr. McDaneld assessed the GBS subtype of acute inflammatory demyelinating polyneuropathy ("AIDP"), impacting only the motor nerves, without significant axonal injury. *Id.* at 10-11. Dr. McDaneld planned a follow-up appointment in 90 days "to ensure that he is continuing to improve." *Id.* at 11.

---

[9] Certain records state that Petitioner tried amitriptyline, but did not find it to be very helpful. *See, e.g.*, Ex. 15 at 9. From my review, the earlier medical records and the parties' briefing do not verify whether or when Petitioner received this drug.

[10] While Petitioner is described as "return[ing] to the neurology clinic," there do not appear to be any prior medical encounters specifically with Dr. MacDaneld. Ex. 5 at 7; *see generally* Exs. 3-4.

5

- At the May 5, 2020, initial outpatient PT evaluation, Petitioner was recorded to have pain (ranging from 0 – 9/10); decreased strength (rated at 25% of normal), stamina, and balance; weakness in all extremities, particularly in his forearms; significant restrictions in ankle dorsal flexion and hamstrings; and difficulty walking on uneven surfaces, hills, and stairs. Ex. 6 at 4-5. The therapist wrote: "[t]herapy will be prolonged due to multiple treatment areas and [the] nature of [his] diagnosis." *Id.* at 5. Petitioner attended 16 total PT sessions over 24 weeks.[11]

- Petitioner's progress was also recorded at periodic neurology follow-ups, which were conducted remotely. First, during an August 19, 2020, telephonic encounter, Petitioner reported that he was "trending toward improvement although it is slow." Ex. 8 at 6.[12] He had continued numbness and pain in his feet; tingling in his hands; and issues with coordination. *Id.* He was "getting stronger slowly over time, but… still at 60 to 65% of his baseline level of strength & endurance." *Id.* Petitioner had self-discontinued his gabapentin, though the record does not indicate why. *Id.*

- Subsequent PT sessions reflect that Petitioner had ongoing pain particularly in his feet. Ex. 9 at 7 (August 7, 2020 – "feeling better at the end of the day but feet still really hurt"); *id.* at 9 (September 3, 2020 – "feet are still bothersome"); *id.* at 11 (September 10, 2020 – "feet are slightly better, looking into orthotics").

- At the last PT session on October 1, 2020, Petitioner reported that his balance was better, but he still had a very hard time going uphill. Ex. 9 at 13. He had pain, poor balance, poor stamina, numb feet, slightly numb hands, and poor grip strength in his thumbs. *Id.* The assessment was "continued poor endurance and foot pain due to neuropathy. *Id.*

- During the next neurology follow-up – conducted telephonically on November 30, 2020 – Petitioner reported "overall lack of endurance and strength and… struggl[ing] with ongoing neuropathic pain in his feet." Ex. 10 at 7. He did not desire "any type of neuropathic pain medication… due to concern for potential side effects." *Id.* He had "been able to go back to work with adaptation to his issues with endurance while walking, however is mostly working from home." *Id.*; *see also* Ex. 11 at 2 (December 15, 2020, letter from the neurologist – documenting that Petitioner reflected "ongoing improvement… left with some residual neurological deficits").

---

[11] PT sessions took place on May 5 (the initial evaluation), May 12, May 19, May 26, June 2, June 9, June 16, June 23, June 30, July 21, July 29, August 13, August 20, September 3, September 10, and October 1, 2020. *See* Ex. 6 at 4-13; Ex. 7 at 19-28; Ex. 9 at 5-14. Respondent's review appears to inadvertently omit the PT sessions reflected in Ex. 7. *See* Response at 3 (stating: "He had five sessions through June 9th… He restarted PT on August 13, 2020, [and had] five additional visits").

[12] These records from SCL Health Medical Group Neurology, encounter date August 19, 2020, was assigned Exhibit 8, as reflected on the exhibit's first page and on the exhibit list. However, within the filing, the bottom of each page is inadvertently Bates-stamped as Ex. 2.

- On June 1, 2021, Petitioner again reported decreased stamina, and a burning numbness in his feet that was worse in the evenings. Ex. 14 at 6. The nurse practitioner suggested trying new medications to treat his neuropathic pain, but Petitioner was "not keen on the idea." *Id.* at 8.

- On December 16, 2021, Petitioner reported sensory deficits in his right forearm. Ex. 15 at 9. More disruptive was his ever-present fatigue which worsened throughout the day, and neuropathic pain (typically ranging from 2 – 3/10 upon waking up, to 6 – 7/10 over the course of a workday and into the evening). *Id.* Petitioner described this pain as "burning" and "very uncomfortable numb sensation," which was worst in the soles, but also in his feet and up into his knees. *Id.* It was aggravated by stress and any activity, including the walking required for his job. *Id.* He sometimes used an expandable walking pole to cover significant distances. *Id.* He also reported ever-present fatigue which worsened throughout the day. *Id.* In light of these symptoms, he was "getting ready to retire, earlier than he would have like[d]." *Id.* In discussing this pain, Petitioner reported that "prior trials of amitriptyline[13] [and] gabapentin" had not been very helpful." *Id.* He was prescribed the neuropathic pain medication Lyrica (pregabalin). *Id.* at 13.

- Finally, on January 26, 2022, Petitioner reported that he had experienced a mild cognitive fog for the first two weeks of Lyrica, which had since gone away. Ex. 16 at 2. The medication was "significantly helping his neuropathic pain… it is never completely controlled but is tolerable." *Id.* The nurse practitioner recorded that he would likely have "long-term sequela from his initial episode including ongoing significant neuropathic pain and significant fatigue," and that he had "retired early because he cannot adequately meet the demands of his job." *Id.* at 5. He would follow up in one year, unless he desired an increased dose of Lyrica. *Id.*

- Petitioner and his wife described the pain and suffering associated with his GBS in affidavits prepared on July 27, 2022. Exs. 17-18. Of note, "within a few weeks of being discharged from inpatient rehab," in or about April 2020, Petitioner resumed working for the power company – but only on his computer at home, as for all employees during the early phase of the COVID-19 pandemic. Ex. 17 at ¶ 3. Petitioner and all other employees began returning to the office/ field gradually starting in June 2020 and were mandated to be back full-time by the end of the year *Id.* at ¶ 14. Petitioner struggled to maintain his job duties, and decided in June 2021 that he would retire, which became effective six months thereafter in December 2021. *Id.* at ¶¶ 15-18. Petitioner now devotes his "limited energy" to the cattle ranch, but a greater bulk of the responsibilities now fall to his wife and other family members. *Id.* at ¶¶ 19-20. The affidavits also describe impacts to his personal life. Exs. 17-18.

---

[13] As noted above, my review of the file did not locate references to amitriptyline.

## IV. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times, Petitioner was a competent adult with no impairments that impacted his awareness. Therefore, I analyze principally the severity and duration of his injury.

I discount Respondent's reference to *unspecified* cases that he states are "factually similar" to Mr. Enstrom's but resolved by way of *proffers prepared by Respondent*. Response at 6. As I have previously noted, a proffer represents *Respondent's* assessment of the case's full value. However, the literal proffer document does not set forth Respondent's complete reasoning for that figure, or whether the petitioner agrees with that reasoning – only that the petitioner has agreed to accept the figure. A petitioner may choose to accept a proffer for a variety of reasons – such as desire to avoid the delays associated with further negotiating and/or litigation, or a time-sensitive personal need for funds. *See* Reply at 4 and n. 4 (internal citations omitted). Additionally, when the Court approves a proffer agreed upon by the parties, the omission of a factual summary serves additional interests of judicial economy and avoiding unwarranted disclosures of a petitioner's medical history. *See* Vaccine Rule 18(b)(2). Thus (and as I often emphasize), citations to specific publicly-available, formally adjudicated reasoned decisions remain the most helpful guidance for resolving damages disputes.

I also note that Respondent's specific proffer in this case ($107,500.00) would likely be lower than any recent reasoned awards for GBS actual pain and suffering, based on my own review (and Respondent has offered no examples of comparable prior awards from *reasoned* decisions).[14] But GBS is a particularly alarming kind of vaccine injury, which generally warrants specific recognition in the amount of the pain and suffering award. *Gross v. Sec'y of Health & Human Servs.*, No. 19-0835V, 2021 WL 2666685, at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2021). Respondent's proffer is not inappropriate *solely* based on this reference to past cases. A pain and suffering award is always determined by a careful review of additional considerations including any hospitalization, invasive procedures, treatments and/or other medications, rehabilitation, recovery, residual effects, and personal/ professional life impacts. But overall considerations lead me to deem Respondent's proposal too low.

---

[14] A brief review of prior determinations did not reveal any reasoned decisions in which a case involving GBS as the injury resulted in pain and suffering awards of less than $125,000.00. *See,* e.g., *Castellanos v. Sec'y of Health & Hum. Servs.*, No. 19-1710V, 2022 WL 2398812 (Fed. Cl. Spec. Mstr. May 31, 2022 ($125,000.00)); *see also Sand v. Sec'y of Health & Hum Servs.*, No. 19-1104V, 2021 WL 4704665 (Fed. Cl. Spec. Mstr. Aug, 31, 2021) ($130,000.00); *Shankar v. Sec'y of Health & Hum. Servs.*, No. 19-1382V, 2022 WL 2196407 (Fed. Cl. Spec. Mstr. May 5, 2022) ($135,000.00).

Here, the evidence best supports that Mr. Enstrom experienced the onset of GBS in early March 2020, followed by a moderate course. He was fortunate to receive a relatively prompt diagnosis and appropriate treatment with IVIg. The ambulance transfer and admission to a higher-level hospital were both precautionary measures taken by the medical providers. Luckily, "he had no further progression of his weakness and numbness… and never had any abdominal, respiratory, or autonomic involvement of his GBS." Brief at 4 (citing Ex. 4 at 245-46). He was in the hospital for six days, followed by inpatient rehabilitation for a further six days. While I recognize that Petitioner utilized supportive devices to ambulate around his home and was assisted by his wife, he did not receive home-based medical care or rehabilitation sessions. At the same time, however, I give some weight to the fact that at onset, Petitioner and his wife decided to travel approximately 90 miles to seek urgent medical treatment on two separate occasions (rather than waiting for a later outpatient evaluation).

The subsequent PT records reflect residual effects through October 1, 2020, without clearly stating whether he had achieved all goals or why therapy was being discontinued. The PT course was relatively limited, consisting of 16 sessions (although more than Respondent's apparent count of 10 sessions, *see* Response at 3). The information in the subsequent neurology records is presumed to be reliable – but necessarily limited, because the encounters all took place over telephone or video, most likely because of the distance that Petitioner would be required to travel for an in-person evaluation and/or recognition of the COVID-19 pandemic. *See* Ex. 4 at 67 (hospital discharge summary recommending social distancing).

Those records reflect that by August 2020, Petitioner was *somewhat* recovered – reporting 60 – 65% of his baseline level of strength and endurance. Ex. 8 at 6. Despite Respondent's argument (Response at 6), that percentage does not necessarily capture his complete clinical picture – because that same report also reflects ongoing sensory symptoms and pain. Moreover, any comparison to Petitioner's pre-GBS baseline is confounded by changed circumstances – specifically, that Petitioner's GBS course coincided with the pandemic, which rather coincidentally, permitted him to work remotely and avoid the most strenuous physical aspects of his job throughout 2020. *See* Ex. 10 at 7. This provides a sufficient explanation for the limited medical care (including Petitioner's self-discontinuation of gabapentin) and his continued employment throughout 2020, followed by his decisions to leave that employment and to try another pain medication, Lyrica, later in 2021. I also recognize the testimonial evidence that Petitioner was less physically active at his home and cattle ranch – transferring many of his prior responsibilities to his family members. *See* Exs. 17-18.

9

Petitioner has offered several comparable pain and suffering determinations, and I find they are helpful benchmarks, if not exactly on point.[15] *Johnson* (awarding $180,000.00) did involve a similar hospitalization and five-day course of IVIg. However, the analysis recognized more severe residual effects – including an inability to drive for several months and long-term incontinence. 2018 WL 5024012, at *7-9. *Fedewa* (also awarding $180,000.00) involved a greater number of attempts to seek medical treatment; "particularly painful… botched" procedures; and longer hospitalization and PT courses. Additionally, the petitioner experienced "considerable suffering" in being unable to care for his own children, as well as anxiety and depression necessitating the prescription medication Wellbutrin for approximately 15 months. 2020 WL 1915138, at *7-9.

Overall, Mr. Enstrom's circumstances were more similar to that of the petitioner in *Gruba v. Sec'y of Health & Hum. Servs.*, No. 19-1157V, 2021 WL 1925630 (Fed. Cl. Spec. Mstr. April 13, 2021) (awarding $165,000.00 for actual pain and suffering, plus $500.00 per year for future pain and suffering). The *Gruba* petitioner received relatively prompt diagnosis and treatment of GBS; a relatively uncomplicated in-patient stay (between hospitalization and in-patient rehab); a limited course of outpatient PT (17 sessions compared to 16 for Mr. Enstrom); and she eventually decided to discontinue a physically-demanding job in light of GBS residuals lasting for over two years. I find that Mr. Enstrom is entitled to a similar award, if slightly higher – of $170,000.00 for actual pain and suffering.[16]

**Conclusion**

Consistent with the above, I award Petitioner a lump sum payment of **$171,279.47 (representing $170,000.00 for actual pain and suffering, plus $1,279.47 for actual unreimbursed expenses).** This amount represents compensation for all damages that

---

[15] Citing *Fedewa v. Sec'y of Health & Human Servs.*, No. 17-1808V, 2020 WL 101518 (Fed. Cl. Spec. Mstr. March 26, 2020) ($180,000.00); *Johnson v. Sec'y of Health & Human Servs.*, No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018) ($180,000.00); *Bircheat v. Sec'y of Health & Human Servs.*, No. 19-1088V, 2021 WL 3026880 (Fed. Cl. Spec. Mstr. June 16, 2021) ($170,000.00); *Gross v. Sec'y of Health & Human Servs.*, No. 19-0835V, 2021 WL 2666685 (Fed. Cl. Spec. Mstr. Mar. 11, 2021) ($160,000.00); *Nelson v. Sec'y of Health & Human Servs.*, No. 17-1747V, 2021 WL 754856 (Fed. Cl. Spec. Mstr. Jan. 13, 2021) ($155,000.00).

[16] This figure also recognizes Mr. Enstrom and his providers' decision to try an additional neuropathic pain medication, which constitutes objective evidence of residual effects until at least January 2022. Ms. Gruba was never prescribed any neuropathic pain medications. However, I decline to award any figure for *future* pain and suffering, as was granted in *Gruba*. 2021 WL 1925630, at *4-5.

would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[17]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[17] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.